William **WAGNER**, Plaintiff,

v.

**CIBA CORPORATION**, Defendant.

Case No. 3:09–CV–0356.

United States District Court,
S.D. Ohio,
Western Division,
at Dayton.

Oct. 19, 2010.

702

David Michael Duwel, Todd T. Duwel, David M. Duwel & Associates, Dayton, OH, for Plaintiff.

Lori A. Clary, Todd L. Sarver, McDonald Hopkins LLC, Columbus, OH, for Defendant.

**ENTRY AND ORDER GRANTING CIBA'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. # 18); OVERRULING WAGNER'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD (Doc. # 21) AND TERMINATING THE CASE**

THOMAS M. ROSE, District Judge.

Plaintiff William Wagner ("Wagner") claims that Defendant CIBA Corporation ("CIBA") wrongfully denied him severance benefits in violation of the Employee Retirement Income Security Act of 1974 ("ERISA"). Now before the Court are Cross–Motions for Judgment On the Administrative Record filed by Wagner and CIBA. The Administrative Record has been filed ("AR") and the motions are now fully briefed and ripe for decision. A factual background will first be set forth followed by the standard of review and an analysis of the Cross–Motions.

## FACTUAL BACKGROUND

Wagner worked at CIBA, a chemical company operating as a subsidiary for BASF, for approximately twenty-two years. (AR at 23.) In a business venture unrelated to his CIBA employment, Wag-

ner purchased fourteen rental properties between September and December of 2006. (AR at 43.) He transferred those properties to D & B Acquisitions, LLC ("D & B"), which was formed with his then business partner David Attarian.[1] (Id.)

In April 2007, Wagner solicited Milt Misogianes, a co-worker of his at CIBA, to invest in properties in Wilmington, Delaware. (Id.) Misogianes agreed, and he loaned D & B approximately $100,000 in the spring of 2007, followed by an additional $75,000 in August of 2008. (Id.) Similarly, Mark McCusker, another of Wagner's co-workers at CIBA, loaned D & B $250,000 in March of 2008, followed by an additional $50,000 in June of 2008, to invest in property in Dundalk, Maryland. (Id.) All of the monies loaned by Misogianes and McCusker were secured by promissory notes. (Id. See also AR at 61–68.) At one time, Wagner, Misogianes, and McCusker all worked under the same supervisor at CIBA. (AR at 44.)

On March 1, 2009, CIBA laid-off Misogianes. (AR at 42.) As a result of his promotion to Business Line Head, Wagner was directly involved with the CIBA team tasked with deciding whether or not Misogianes would be laid-off. (AR at 36–37.) Wagner's supervisor Michael McHenry stated that Wagner attempted to influence the team to retain Misogianes during this process, but to no avail. (Id.)

When Misogianes returned his company laptop, CIBA discovered voluminous e-mail correspondence on his hard drive directly related to the foregoing real estate transactions which Misogianes and McCusker entered into with Wagner and Attarian. (Id.) E-mail directories pulled off of Misogianes's computer uncovered messages sent related to the real estate transactions between Misogianes, McCusker, and Wagner from March 2007 through January 2009. (AR at 42.) Similar messages later pulled from Wagner's computer dated from December 2008 through March 2009. (Id.)

After uncovering the initial evidence from Misogianes's computer, CIBA hired Scott Forensic Auditing, LLC to investigate Wagner's real estate interests. (AR at 41.) The investigation uncovered Wagner's aforementioned real estate dealings, along with his transacting business using company resources during work hours, primarily via e-mail.[2] (AR at 42.) CIBA also discovered that Wagner had been a licensed real estate agent since April 2007 and had a real estate practice in Ohio. (AR at 7 & 44.) Moreover, Wagner was a 50% member of D & B and the sole owner of WHW Acquisitions. (AR at 42.)

Board minutes from a September 4, 2008, D & B meeting indicated that D & B was suffering financially by the fall of 2008, and that "all responsibilities and dealings on behalf of D & B [fell] to" Wagner. (AR at 111.) Furthermore, CIBA discovered that Misogianes had sued Wagner and WHW[3] in a Delaware Chan-

---

**1.** In November of 2008, Mr. Attarian left D & B under agreement with Wagner, and Wagner transformed D & B into WHW Acquisitions, which he operated solely. For ease of conversation the Court will generally refer to both as D & B throughout this opinion. (AR at 42 & 48.) Incidentally, Mr. Attarian and Mr. Wagner also operated Rapid Restorations, Inc. and D B Pinnacle Properties, LLC, both of which appear to have been merged into either D & B or WHW by March 2008. (AR at 43 & 44.)

**2.** The Administrative Record contains voluminous e-mail correspondence sent by Mr. Wagner regarding his personal real estate transactions. (AR 69–80; 113–137). The vast majority of these messages were sent during ordinary office hours. (Id.)

**3.** Wagner merged D & B into WHW in November of 2008. (AR at 43.)

cery Court in November 2008, in an action to enforce his two promissory notes after D & B defaulted on the loans. (AR at 47.) Despite D & B's financial struggles, Wagner continued his attempts to rectify the situation. (AR at 75–76.)

The record shows that all four of the promissory notes executed to McCusker and Misogianes respectively were in default by September of 2008. (AR at 43 & 81.) Around the time that Misogianes was laid-off from CIBA, Wagner was in the process of negotiating a forbearance agreement with McCusker and Misogianes in exchange for their not pursuing legal remedies on the defaulted notes.[4] (AR at 81–90.) A preliminary draft of the agreement indicates that D & B owed Misogianes and McCusker a combined total of approximately $483,088.03, including interest, on the four notes. (AR at 81.) It is unclear whether or not this agreement was ever finalized.

At the conclusion of Scott Forensic's investigation, one of the investigators, Max Hanson, confronted Wagner regarding his outside real estate business. (AR at 22.) During the course of that conversation, Wagner acknowledged his business relationship with Misogianes. (Id.) Mr. Hanson informed Mr. Wagner that his unauthorized outside business interests, and his conducting those interests on company time and e-mail, were violations of the CIBA Code of Conduct ("the Code"). (Id.) Hanson informed Wagner that he could resign or be terminated, and Wagner chose to resign. (AR at 1 & 22.)

4. The record indicates that the forbearance agreement would have acted as some method of settlement of Misogianes's earlier lawsuit. (AR at 74–75.)

5. Employees who separate from the Company after January 1, 2008, are entitled to one

### A. CIBA's Severance Policy

CIBA's Severance Policy ("the Policy") provides that salaried employees who have completed at least one year of regular full-time service may be eligible for severance pay.[5] (AR at 144.) However, the plan contains exclusions from eligibility including:

> **–Where termination of employment is due to discharge, separation for cause, resignation, long-term disability, or retirement, no benefits shall be paid.**
>
> **–Where the Committee determines in its sole discretion that an employee has deliberately brought about his/her separation in order to qualify for severance pay, no payments will be made.**

(AR at 146.) Discharge is defined as "termination of employment initiated by the Company because of gross misconduct or dishonesty on the part of the employee, including but not limited to theft, conflict of interest or actions detrimental to the Company." (AR at 143.) Resignation is defined as "termination of employment voluntarily initiated by the employee." (Id.)

The Policy also contains the following "Determination of Eligibility:"

> **An initial determination of eligibility will be made at the sole discretion of the director responsible for the Human Resources function of any segment, plant or operating unit in which an affected employee is employed. An appeal of that decision will be made to the Human Resources Vice president of the Company and then to the Employee Benefits Committee as De-**

week of pay for each year of service to the Company, up to a maximum of twenty weeks. (AR at 146.) Also, any employee who signs a general release is entitled to a variety of additional benefits. (Id.)

scribed in the Claims Appeal Process of this Summary Plan Description.

(AR at 147.) A section titled "Plan Administration" expressly states:

> The Board of Directors of the Company has employed an Employee Benefits Committee which administers the Plan. The Committee has the discretionary authority to interpret the Plan, determine eligibility, and hear any appeals of benefit denials.

(Id.) The Claims Appeal Procedure states, in pertinent part, that:

> In the event a claim has been denied in whole or in part, you or your beneficiary can request a review of your claim by the Company's Vice President, Human Resources. If the claim is still denied, an appeal may be made to the Committee. Any Appeals to the Committee may be sent to the Committee through the Vice President of Human Resources within 60 days after you receive notice of denial of the claim. When requesting a review, please state the reason you believe the claim was improperly denied and submit any data, questions or comments you deem appropriate. The Committee will review all the information and you will be informed of the decision in writing in a timely manner.

(AR at 147–48.) The Severance Policy also gives a detailed explanation of participants' rights under ERISA. (AR at 148–49.)

### B. CIBA's U.S. Code of Conduct

In May of 2006, CIBA issued a Code of Conduct ("the Code") which clearly outlined the conduct expected of all CIBA employees. (AR at 151.) The Code expressly prohibits all conflicts of interest "unless full disclosure is made and written approval is given by a member of the NAFTA Leadership Team or a Segment or Group Services Head." (AR at 159.) Prohibited conflicts of interest include:

> [N]ot engag[ing] in *any* outside employment when the nature of such employment or the time commitment involved would deprive the company of your full loyalty. If you are an exempt colleague, any outside employment is prohibited unless you make full disclosure and obtain the approval of such employment from a NAFTA Leadership Team member or a Segment or Group Services Head.

(AR at 159–60.)(emphasis added). The Code also requires employees with knowledge of legal or ethical violations to come forward and report the wrongdoing to the appropriate entity. (AR at 161.) Lastly, the Code contains the following disciplinary standard:

> If you fail to meet your obligations under the Code of Conduct, you will be subject to serious disciplinary measures, including possible termination of your employment with the Company.

(AR at 162.)

### C. Administrative Review & Procedural History

Initially, CIBA determined that Wagner's resignation and his violations of the Code rendered him ineligible for customary severance benefits under the Policy. (AR at 14.) However, CIBA decided to offer Wagner a modified severance package in exchange for his signing a general release. (Id.) Wagner rejected the offer and sought review of CIBA's decision to deny him full severance benefits. (AR at 2–3.)

Consistent with the Policy, Wagner's claim for benefits was reviewed by the Vice President of Human Resources, Cherie Hutton. (AR at 10–11.) In denying Wagner's claim appeal, Hutton explained that his outside business interests, including taking loans from co-workers, violated

the Code of Conduct because he never received written approval for the business conflicts. (AR at 10.) Furthermore, Wagner conducted a significant amount of his outside business activities on company time, using company resources. (Id.) Pursuant to the Policy procedures, Wagner appealed the denial to the Employee Benefits Committee ("the Committee"). (AR at 5.)

In his appeal letter to the Committee, Wagner argued that the Code was unclear as to whether it required written approval of outside business conflicts. (AR at 5–6.) He also argued that many other CIBA employees had engaged in unauthorized outside business conflicts without any repercussions. (AR at 6–7.) In addition, Wagner asserted that he had provided twenty-two years of impeccable service to CIBA and his real estate projects in no way negatively affected his job performance.[6] (AR at 7–8.)

Following its review, the Committee upheld the denial of benefits, primarily, because Wagner elicited loans from CIBA coworkers, in violation of the Code. (AR at 39.) The Committee agreed with Ms. Hutton's determination that Wagner had "violated the Code by not obtaining the appropriate approval for his outside business" interests. (Id.) The Committee went on to state:

> [W]hat [we] **found to be particularly egregious was that Wagner, as a member of his segment's leadership team, was taking substantial loans from other employees to finance his outside business and eventually became embroiled in litigation with them.**

(Id.)

By the same token, the Committee was disturbed with Wagner's non-disclosure of his outside business interests. (AR at 40.)

The Committee dismissed Wagner's argument that he was told he could obtain full severance by resigning because no such promise was made by authorized individuals. (Id.) Furthermore, the Committee concluded that Wagner's performance evaluations and testimonials were irrelevant to the matter at hand. (AR at 40.)

Wagner filed this Complaint on September 15, 2009. He alleged the following causes of action: (1) recovery of plan benefits under ERISA; (2) breach of fiduciary duty under ERISA; (3) recovery of attorneys' fees and costs under ERISA; (4) tortious interference with business relations; and (5) wrongful discharge in violation of public policy. (Doc. # 2, ¶¶ 22–46.) The Court denied Wagner's request to conduct discovery beyond the administrative record. (Doc. # 13.) CIBA's motion for judgment on the pleadings as to Wagner's state law claims was granted and those claims were dismissed accordingly. (Doc.# 24). Consequently, the only claims currently remaining before this Court are Wagner's three ERISA causes of action.

## STANDARD OF REVIEW

A participant or beneficiary of an ERISA qualified plan may bring suit in federal court to recover benefits due under the terms of the plan. 29 U.S.C. § 1132(a)(1)(B). The standard of review for ERISA claims to recover benefits, such as this one, has often been repeated by the Sixth Circuit.

A challenge to the denial of ERISA benefits is ordinarily reviewed de novo. *Smith v. Bayer Corp. Long Term Disability Plan*, 275 Fed.Appx. 495, 504 (6th Cir.2008)(citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). However, if

---

**6.** Mr. Wagner's performance evaluations and testimonials from his business contacts all indicate that he was a competent employee during most of his twenty-two years at CIBA.

the plan in question grants discretionary authority to the administrator to determine benefit eligibility, the challenge to the benefits denial is reviewed under an arbitrary and capricious standard. *Id.* (citing *Calvert v. Firstar Finance, Inc.,* 409 F.3d 286, 291–92 (6th Cir.2005)).

■■■ The Sixth Circuit does not require a plan to use any magic words such as "discretionary" to create discretionary authority for a plan administrator to determine benefits or interpret the plan. *Johnson v. Eaton Corp.,* 970 F.2d 1569 at n. 2 (6th Cir.1992). Yet the Sixth Circuit has consistently required "a clear grant of discretion [to the administrator]" before replacing its duty to engage in de novo review with the arbitrary and capricious standard. *Wulf v. Quantum Chemical Corp.,* 26 F.3d 1368, 1373 (6th Cir.1994), *cert. denied,* 513 U.S. 1058, 115 S.Ct. 667, 130 L.Ed.2d 601 (1994). When considering whether a clear grant of discretion is given, courts are to "focus on the Breadth of the administrators' power-their 'authority to determine eligibility for benefits or to construe the terms of the plan.'" *Perez v. Aetna Life Insurance Co.,* 150 F.3d 550, 555 (6th Cir.1998)(en banc)(citing *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1453 (D.C.Cir.1992), *cert. denied,* 531 U.S. 814, 121 S.Ct. 49, 148 L.Ed.2d 18 (2000)).

■■■ Wagner argues that CIBA's Severance Policy does not clearly provide the plan administrator with discretionary authority in making eligibility determinations, and therefore, asks this Court to apply a de novo standard of review. (Doc. # 21 at 6.) The crux of Wagner's argument is that the language of the Policy only gives discretionary authority to the segment Human Resources director, but it does not give either the Human Resources Vice President or the Employee Benefits Committee discretionary authority during the second and third administrative phases. (Doc. # 21 at 7.) Because ERISA does

not require this Court to give deference to the segment director, Wagner claims a de novo standard of review should apply. Wagner's argument is unpersuasive.

As explained previously, the Sixth Circuit does not require the Policy to use any magic words such as "discretionary" to create discretionary authority for a plan administrator to determine benefits or interpret the Policy. In determining whether the Policy administrator is given the requisite discretion under the Policy this Court must "focus on the Breadth of the administrators' power—their 'authority to determine eligibility for benefits or to construe the terms of the plan.'" *Perez v. Aetna Life Insurance Co.,* 150 F.3d at 555 (citing *Block v. Pitney Bowes, Inc.,* 952 F.2d 1450, 1453 (D.C.Cir.1992), *cert. denied,* 531 U.S. 814, 121 S.Ct. 49, 148 L.Ed.2d 18 (2000)). In this instance, the Policy expressly provides that:

> **The Board of Directors of the Company has employed an Employee Benefits Committee which administers the Plan. The Committee has the *discretionary authority* to interpret the Plan, determine eligibility, and hear any appeals of benefit denials.**

(AR at 147.)(emphasis added). This language expressly gives the Employee Benefits Committee discretionary authority to determine eligibility for severance benefits as a plan administrator. Wagner appealed his denial of severance benefits to the Employee Benefits Committee, and it exercised its discretionary authority under the Policy by denying his appeal. (AR at 5–9; 36.)

*A. Conflict Between the SPD and the Original Plan Document*

Alternatively, Wagner argues that even if CIBA's Summary Plan Description ("SPD") expressly grants the Committee discretion to deny him severance benefits,

such a grant is not enough if the Committee is not given that authority in the original Plan document. (Doc. # 22 at 3.) What is more, Wagner contends that the SPD is not an accurate summary of the actual Plan, and therefore, he was never properly informed of his rights as required under ERISA (Id. at 3–4.)

■ A SPD must "be written in a manner calculated to be understood by the average plan participant and ... sufficiently accurate and comprehensive to reasonably apprise such participants and beneficiaries of their rights and obligations under the plan." 29 U.S.C. § 1022(a). ERISA regulated plans must be administered "in accordance with the documents ... governing the Plan." 29 U.S.C. 1104(a)(1)(D). In other words, the general rule is that Plan documents, including SPDs, exclusively govern an employer's obligations. *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 402 (6th Cir.1998). Where there is a conflict between the language of an employee benefits plan and an SPD, the SPD governs. *Edwards v. State Farm Mut. Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988) (citing *Rhoton v. Central States, Southeast & Southwest Areas Pension Fund,* 717 F.2d 988, 989 (6th Cir.1983)). In *Edwards v. State Farm,* the Sixth Circuit Court of Appeals held that the terms of an SPD distributed to plan participants override terms in an inconsistent plan. The *Edwards* court reasoned that, "[i]t is of no effect to publish and distribute a plan summary booklet designed to simplify and explain a voluminous and complex document and then proclaim that any inconsistencies will be governed by the plan." *Edwards,* 851 F.2d at 136.

The Sixth Circuit has repeatedly held, however, that *Edwards* requires more than inconsistency; "rather, the SPD and the plan document must directly conflict." *Foltice v. Guardsman Prods., Inc.,* 98 F.3d 933, 938 (6th Cir.1996). *See also Garst v.*

*Wal–Mart Stores, Inc.,* 30 Fed.Appx. 585 (6th Cir.2002) (stating that reliance on *Edwards* is misplaced where there is nothing to indicate that there is a conflict between the terms of the SPD and those of the underlying plan). The *Sprague* Court specifically stated: "[T]he principle announced in *Edwards* does not apply to silence.... An omission from the summary plan description does not, by negative implication, alter the terms of the plan itself. The reason is obvious: by definition, a summary will not include every detail of the thing it summarizes." *Sprague v. Gen. Motors Corp.,* 133 F.3d at 401.

In support of his argument Wagner relies primarily on *Jobe v. Medical Life Ins. Co.,* 598 F.3d 478 (8th Cir.2010). In *Jobe,* a SPD conferred discretionary authority upon a plan administrator in making benefit determinations, but the original plan document was silent as to such a grant of discretionary authority. *Id.* at 484. The SPD expressly provided that in the event the SPD and the plan conflicted "the Plan will always control." *Id.* at n. 4. In addition, the SPD expressly stated that no rights arose out of the SPD. *Id.* The Eighth Circuit parted from the general rule that the SPD supersedes the original plan when the two conflict because "to hold that the summary plan description always prevails over the policy—even where the summary plan description indicates the policy prevails—would only invite further confusion for employees." *Id.* The Court held that a *de novo* standard of review should have been applied. *Id.* at 486. *Jobe* is distinguishable from the facts of the case sub judice.

■ This Court is confined to the record that was before the plan administrator in making its determination. *Wilkins v. Baptist Healthcare Sys. Inc.,* 150 F.3d 609, 615 (6th Cir.1998). *See also Perry v. Simplicity Engineering,* 900 F.2d 963, 966 (6th

Cir.1990). Quite simply, no original Plan document is contained in the administrative record before this Court. The SPD expressly states:

> If you have specific questions you should consult the Committee or the actual Plan document, which is available from the Committee. In the case of any conflict between the Plan and this Summary Plan Description, the Plan document will control.

(AR at 143.) If Wagner truly believed that a conflict existed between the SPD and the original Plan then he should have requested a copy of the Plan. Wagner had multiple opportunities to request a copy of the original Plan and add it to the record as instructed by the SPD, but he never did. (AR at 2–3; 5–9; 12–13; 138–39.) The first time he offered this argument was in his Response Brief to this Court. (Doc. # 22 at 2–4.)

■ Similar to the facts at hand, in *Groves v. Metropolitan Life Ins. Company*, an employee seeking long-term disability benefits objected to the use of an SPD because MetLife had not placed the original plan document in the record. *Groves v. Metropolitan Life Ins. Company*, 438 F.3d 872, 874, at n. 2 (8th Cir.2006). In deciding that the plan administrator had discretionary authority under the SPD, the court noted that the employee had not argued that the SPD represented an "inaccurate statement of the plan's terms." *Id.* As a result, the SPD was "acceptable evidence of the plan terms." *Id.* Similar to *Groves*, Wagner has not placed the original Plan document on the record. Unlike *Jobe*, this is not a circumstance where a direct conflict exists between the SPD and the original Plan document.

Because no original Plan document is contained in the record, this Court will give plain meaning to the SPD, which expressly confers discretionary authority on the Committee to render benefit determi-

nations. If the original Plan and the SPD do in fact directly conflict on this point, then Wagner has no one to blame but himself for failing to protect the record. This Court will not invent a conflict where one does not exist.

By the same token, Wagner's argument that the SPD fails to provide an accurate summary of the Plan fails. What is more, Wagner claims that because the SPD is inaccurate, he was denied his rights under ERISA to review the entire Policy. Clearly, the SPD gives Wagner access to the original Plan document, and there is no evidence on the record that he ever requested a copy. Likewise, there is no evidence that CIBA denied any such request. The SPD clearly defines Wagner's rights under the Plan, and there is no evidence to the contrary.

After careful review of CIBA's Severance Policy, it is clear that the Employee Benefits Committee is given broad discretionary authority by CIBA's Board of Directors to determine eligibility for severance benefits. What is more, there is no evidence which would suggest that the SPD conflicts with the original Plan document. Similarly, there is no evidence which would show that the SPD is an inaccurate summary of the Policy. Because the Policy clearly grants the Committee discretionary authority to determine eligibility, this Court will apply the arbitrary and capricious standard of review to Wagner's challenge.

### B. Arbitrary and Capricious Review

■ An arbitrary and capricious review is "extremely" deferential. *Smith*, 275 Fed.Appx. at 504 (citing *McDonald v. Western–Southern Life Ins. Co.*, 347 F.3d 161, 172 (6th Cir.2003), *aff'd*, 554 U.S. 105, 128 S.Ct. 2343, 171 L.Ed.2d 299 (2008)). However, when undertaking a review under an arbitrary and capricious standard,

an administrator's decision is not merely "rubber stamped." *Id.*

■ When it is possible to offer a reasoned explanation, based upon the evidence, for a particular outcome, that outcome is not arbitrary or capricious. *Rose v. Hartford Financial Services Group, Inc.,* 268 Fed.Appx. 444, 449 (6th Cir.2008)(citing *Hunter v. Caliber Sys., Inc.,* 220 F.3d 702, 710 (6th Cir.2000)). Stated another way, if the decision "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence, the decision will be upheld." *Id.* (quoting *Elliott v. Metropolitan Life Ins. Co.,* 473 F.3d 613, 617 (6th Cir.2006)).

■ When applying arbitrary and capricious review, courts affirm administrative decisions "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome. . . ." *Davis By and Through Farmers Bank and Capital Trust Company of Frankfort, Kentucky v. Kentucky Finance Companies' Retirement Plan,* 887 F.2d 689, 693 (6th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990). Therefore, an administrator's decision must be supported by evidence. *Killian v. Healthsource Provident Administrators, Inc.,* 152 F.3d 514, 520 (6th Cir.1998). In sum, the decision of the administrator is upheld if it is the result of a deliberate principled reasoning process, if it is supported by substantial evidence and if it is based upon a reasonable interpretation of the plan. *Id.* at 520 (quoting *Baker v. United Mine Workers of America Health and Retirement Funds,* 929 F.2d 1140, 1144 (6th Cir.1991)).

■ On the other hand, indications of arbitrary and capricious decisions include a lack of substantial evidence, a mistake of law, bad faith and a conflict of interest by the decision-maker. *Caldwell v. Life Insurance Co. of North America,* 287 F.3d 1276, 1282 (10th Cir.2002). Also, a decision based upon a selective review of the record or an incomplete record is arbitrary and capricious. *Moon v. Unum Provident Corp.,* 405 F.3d 373, 381 (6th Cir.2005).

## DISCUSSION

### I. Violation of Procedural Rights Under 29 U.S.C. § 1133 & 29 C.F.R. § 2560.503–1(b)(1)

Wagner argues that CIBA failed to follow the proper procedural mechanisms set forth in 29 C.F.R. § 2560.503–1(b)(1) in denying his claim for benefits. Specifically Wagner contends that CIBA failed to inform him of his rights under the Plan. (Doc. # 2 at 4, ¶ 19.) CIBA counters that a cause of action for an improper claims procedure must be alleged under 29 U.S.C. § 1133, and Wagner did not include such a count in his complaint. (*See* Doc. # 2.) Alternatively, CIBA claims that at all times it provided Wagner with adequate notice of his rights under the Policy and conducted a full and fair review of his denial of benefits. (Doc. # 23 at 13.)

ERISA provides that every employee benefit plan shall:

**(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and**

**(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.**

29 U.S.C. § 1133(1–2). The Department of Labor expands on the procedural requirements § 1133 by providing that "a plan will not be deemed to provide a claimant with a reasonable opportunity for a full

and fair review of a claim of an adverse benefit determination unless the claims procedure[s]":

 **(I) Provide claimants at least 60 days following receipt of a notification of an adverse benefit determination within which to appeal the determination;**

 **(ii) Provide claimants the opportunity to submit written comments, documents, records, and other information relating to the claim for benefits;**

 **(iii) Provide that a claimant shall be provided, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claimant's claim for benefits. Whether a document, record, or other information is relevant to a claim for benefits shall be determined by reference to paragraph (m)(8) of this section;**

 **(iv) Provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.**

29 C.F.R. 2560.503–1(h)(2).

 CIBA first argues that Wagner failed to state a cause of action under § 1133 in his complaint. (*See* Doc. # 2.) Under Fed.R.Civ.P. 8, a plaintiff's complaint need not point to the proper law or statute in order to raise a claim for relief. *U.S. ex rel. Tillson v. Lockheed Martin Energy Sys., Inc.*, No. 5:00CV–39–M, 2004 WL 2403114, at *14, 2004 U.S. Dist. LEXIS 22246 at *43–44 (W.D.Ky. Sept. 29, 2004). A "complaint sufficiently raises a claim even if it points to no legal theory or even if it points to the wrong legal theory as a basis for that claim, as long as relief is possible under any set of facts that could be established consistent with the allega-

tions." *Id.* (quoting *Tolle v. Carroll Touch, Inc.*, 977 F.2d 1129, 1134 (7th Cir. 1992)). Although Wagner does not expressly state a cause of action under 29 U.S.C. § 1133, the Court is satisfied that he has sufficiently stated a claim for relief under that provision because relief is possible under any set of facts that could be established consistent with his allegations.

 Nevertheless, "the question of whether the procedure employed by the fiduciary in denying the claim meets the requirements of Section 1133 is a legal question which the Court must review de novo." *Bartling v. Fruehauf Corp.*, 29 F.3d 1062, 1069 (6th Cir.1994). A plan administrator must "provide the specific reason or reasons for denial and the specific reference to pertinent plan provisions on which the denial is based." *VanderKlok v. Provident Life and Accident Ins. Co.*, 956 F.2d 610, 615 (6th Cir.1992). However, the Sixth Circuit has found that "when claim communications as a whole are sufficient to fulfill the purposes of Section 1133 the claim decision will be upheld even if a particular communication does not meet those requirements." *Kent v. United of Omaha Life Ins. Co.*, 96 F.3d 803, 807 (6th Cir.1996).

 Wagner's claim for a violation of his procedural rights under ERISA fails. In this case, CIBA's claim communications were clearly sufficient. First, CIBA provided Wagner 60 days to appeal his denial of benefits to the Employee Benefits Committee and Wagner exercised that right. (AR at 11; 5–9.) The Policy also expressly provided 60 days to appeal an adverse benefits decision. (AR at 148.) Second, the Committee afforded him the opportunity to submit any documents he believed supported his claim, and Wagner submitted several testimonials and performance reviews to that effect. (AR at 17–35.) Third, the Policy informed Wagner of his

right to request materials from the Committee, and there is no evidence in the record that CIBA ever denied Wagner access to any documents and/or records relevant to his claim for benefits. (AR at 148.)

Wagner's primary argument here is that CIBA did not properly consider all the comments, documents, records, and other information he submitted in reaching its determination, and as a result, deprived him of his procedural rights under the law. However, aside from self-serving accusations to that effect, Wagner has provided no evidence which would show that CIBA failed to conduct a complete and thorough review of all relevant documentation related to his claim. On the contrary, the Committee expressly acknowledged its receipt and review of Wagner's documentation in its notice denying his benefits appeal. (AR at 39.) Lastly, each time CIBA denied Wagner's claim for severance benefits it provided a detailed explanation of the reasons why it was denying his claim. (AR at 10–11; 39–40.) As a result, this Court finds that CIBA provided Wagner with a reasonable opportunity for a full and fair review of his denial of severance benefits as required by ERISA and the pertinent regulations.

## II. Denial of Severance Benefits

Next, CIBA argues that Wagner violated the Policy's prohibitions on conflicts of interest, and therefore, it justifiably denied him severance benefits. Alternatively, it contends that Wagner voluntarily resigned, a decision which would also preclude his collecting severance benefits under the Policy.

Conversely, Wagner argues that under ERISA a benefits determination must be made in the interest of the participants "with the care, skill, prudence, and diligence under the *circumstances then prevailing*." 29 U.S.C. § 1104(a)(emphasis added). Wagner maintains that the pre-

vailing circumstances at CIBA allowed similarly situated employees to engage in prohibited conflicts of interest without any repercussions. (Doc. # 21 at 8.) Furthermore, Wagner asserts that he obtained approval for his outside real estate ventures and those conflicts never affected his job performance at CIBA. (Doc. # 22 at 7.) Lastly, Wagner refutes CIBA's argument that he voluntarily resigned and counters that CIBA acknowledges he was terminated. (AR at 39.)

CIBA counters that Wagner has failed to submit any evidence that other CIBA employees were allowed to pursue outside business interests without following the steps outlined in the Policy. (Doc. # 23 at 11–12.) Regardless, CIBA argues that Wagner's outside business interests "were so intertwined with his employment with CIBA that an impermissible conflict arose." (Id. at 14.) In addition, CIBA contends that Wagner failed to show that his former manager, Bill Baker, was aware of and approved his outside real estate ventures. (Id.)

Incidentally, the parties have argued the merits of whether or not Wagner was properly denied severance benefits under: (a) a discharge theory; and/or (b) a resignation theory. The Court will address each argument in turn.

### A. Conflicts of Interest & Discharge

The aforementioned CIBA Severance Policy contains the following exclusion:

**Where termination of employment is due to discharge, separation for cause, resignation, long-term disability, or retirement, no benefits shall be paid.**

(AR at 146.) Discharge is defined as "termination of employment initiated by the Company because of gross misconduct or dishonesty on the part of the employee, including but not limited to theft, *conflict*

*of interest* or actions detrimental to the Company." (AR at 143.)(emphasis added).

As stated previously, CIBA's Code of Conduct prohibits employees from:

> [E]ngag[ing] in *any* outside employment when the nature of such employment or the time commitment involved would deprive the company of your full loyalty. If you are an exempt colleague, any outside employment is prohibited unless you make full disclosure and obtain the approval of such employment from a NAFTA Leadership Team member or a Segment or Group Services Head.

(AR at 159–60.)(emphasis added). The Code also requires employees to come forward when they have knowledge of a violation of the Code (AR at 161.) Lastly, if an employee fails to come forward, such failure could result in termination. (AR at 162.)

The record reflects that for several years Wagner engaged in significant real estate business during but separate and apart from his employment with CIBA. He solicited and obtained large loans from co-workers at CIBA to help fund business ventures at D & B. (AR at 43.) When business went south, one of his CIBA co-workers, Milt Misogianes, attempted to collect on a defaulted promissory note by filing a lawsuit against Wagner and WHW. (AR at 47.) All told, it appears that D & B and Wagner owed Misogianes and McCusker more than $400,000. A few months later, Wagner was a member of the team tasked with determining whether or not Misogianes would be laid-off. (AR at 36.) Furthermore, the record is replete with e-mail correspondence from Wagner

concerning his outside real estate ventures.[7] (AR at 69–80; 113–137.)

Wagner contends that he received oral approval from Bill Baker to conduct his outside business interests. (Doc. # 22 at 7.) However, the Policy specifically states that *written approval* is required for outside business activities. (AR at 159–60.) There is no evidence in the record showing that Bill Baker gave a blanket written approval to Wagner for his outside real estate ventures, including his obtaining substantial loans from CIBA co-workers. As CIBA points out, Wagner promised a letter from Baker "documenting his knowledge and approval of Mr. Wagner's rental business" but such a letter was never submitted. (AR at 3.)

Moreover, the Policy specifically requires full disclosure of outside business interests. (AR at 159–60.)(The Policy states that outside employment is prohibited unless an employee makes "full disclosure *and* obtains written approval.") (Id.) Wagner never fully disclosed the extent of his outside business dealings to CIBA. It was not until CIBA conducted an internal investigation and confronted Wagner that it became fully aware of the gravity of his outside business ventures. (AR at 42.) Wagner contends that he has been forthright and answered any question CIBA has asked. (Doc. # 22 at 7.) However, Wagner's argument is unavailing. Wagner's duty of full disclosure did not mean sitting back and waiting for someone to ask the right question. He had an affirmative duty to disclose all of his outside business dealings to CIBA under the Policy. This he failed to do.

---

**7.** CIBA's Code of Conduct allows for "limited" private use of company resources provided such use does not affect job performance. (AR at 158.) CIBA concluded that Wagner's outside business interests justified his termination and denial of benefits. (AR at 39.)

Therefore, evidence of Wagner's violation of the Company's communications policy does not give rise to a separate issue, but merely supports CIBA's conclusion that Wagner was engaged in unauthorized conflicts of interest.

Next, Wagner asserts that CIBA's review must be made in the interest of the participants "with the care, skill, prudence, and diligence under the *circumstances then prevailing.*" 29 U.S.C. § 1104(a)(emphasis added). Essentially, Wagner contends that the Committee failed to consider that other co-workers at CIBA maintained outside business interests without obtaining authorization, and apparently without suffering professional repercussions, in making its decision to deny him severance benefits. (Doc. # 21 at 9–10.) Wagner submits that he is merely asking "CIBA [to] apply the Code in the same scope and manner that had become customary by the Spring of 2009." (Id. at 10.) However, there is no evidence on the record which supports Wagner's argument, only accusations. Accusations unsubstantiated by the record will not facilitate a reversal under an arbitrary and capricious standard of review.

Wagner also argues that his outside business interests did not negatively affect his job performance at CIBA, and therefore, were not "conflicts" under the Policy. (Doc. # 22 at 8.) Wagner has submitted various letters applauding his job performance at CIBA, as well as performance reviews showing that he was a competent employee. (AR at 18–35.) However, Wagner must do more than point to supportive evidence in the record to prevail on his challenge. He must show that CIBA's decision to deny him severance benefits was patently unreasonable.

 Considering the evidence before it, this Court concludes that the Committee's decision to deny Wagner severance benefits was reasonable and consistent with the terms of its Policy and Code. The record shows that Wagner never fully disclosed nor obtained written approval for his outside business ventures. Moreover, it was reasonable for CIBA to conclude that Wagner's outside business dealings conflicted with his employment at CIBA. Indeed, the Committee pointed out that "it was Wagner's solicitation of money from co-workers and non disclosure which most upset the Committee." (AR at 40.)

Wagner's conflicting business ventures were expressly prohibited by CIBA's Code of Conduct and resulted in his discharge and subsequent denial of severance benefits consistent with the terms of Policy. Furthermore, Wagner has presented no evidence which would show that he had either: (a) the appropriate authorization for his outside business ventures; or (2) that CIBA's denial was inconsistent with the circumstances then prevailing at the Company. The denial of benefits in this case came as a result of a deliberate principled reasoning process, was supported by substantial evidence, and was based upon a reasonable interpretation of the Policy. *Killian v. Healthsource Provident Administrators, Inc.,* 152 F.3d at 520 (6th Cir.1998)(quoting *Baker v. United Mine Workers of America Health and Retirement Funds,* 929 F.2d 1140, 1144 (6th Cir. 1991)). Because the Committee's determination was reasonable and supported by the evidence, it is hereby upheld.

### B. Resignation

Alternatively, CIBA argues that Wagner voluntarily resigned from his employment, a decision which also justified its denial of severance benefits under the Policy. The Policy defines resignation as "termination of employment voluntarily initiated by the employee." (AR at 143.) The record contains a handwritten note from Wagner where he states, "I William Wagner hereby give my immediate resignation. April 1, 2009." (AR at 1.) Wagner argues that the circumstances surrounding his resignation rendered it involuntary. (Doc. # 22 at 5.) Furthermore, Wagner contends that CIBA subsequently conceded he had been

terminated for cause in its denial of severance benefits. (AR at 37 & 39.)

This Court has already determined that CIBA's denial of severance benefits was reasonable under the Code and the Policy because CIBA *discharged* Wagner for engaging in prohibited outside business ventures. In its letter to Wagner denying him severance benefits CIBA concluded that "[Wagner's] violation of the Code of Conduct constituted cause for his termination." (AR at 39.) In the aforementioned letter the Committee did mention Wagner's "April 1 resignation and termination," but that is the only time that his departure is cached as a "resignation." (AR at 40.) The Committee's reasoning focuses on its having just cause to terminate Wagner under the Code, and consequently, deny him severance benefits. (AR at 37–40.) However, CIBA resurrects its argument that Wagner voluntarily resigned in its respective briefs submitted to this Court. (Doc. # 18 at 15; Doc. # 23 at 5.)

As explained earlier, in conducting an arbitrary and capricious review, this Court will affirm a plan administrator's determination "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome .... " *Davis By and Through Farmers Bank and Capital Trust Company of Frankfort, Kentucky v. Kentucky Finance Companies' Retirement Plan,* 887 F.2d 689, 693 (6th Cir.1989), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 288 (1990). In denying Wagner severance benefits under a Policy exclusion, the Committee's reasoning focused on CIBA's having cause to terminate his employment under the Code. (AR at 37–40.) The Committee merely referred to Wagner's April 1 resignation, but it did not explain why his resigning justified his not receiving severance benefits. (AR at 40.)

The Court recognizes that the Committee may not have offered sufficient reasoning in its decision as to why Wagner's resignation resulted in his denial of severance benefits under the Policy. However, because this Court has already determined that the Committee's decision denying Wagner severance benefits was patently reasonable on "discharge" grounds, the issue of whether or not that decision was also reasonable on "resignation" grounds is rendered moot. As a result, this Court declines to address it.

### III. Breach of Fiduciary Duty

■ The Sixth Circuit has held that a plan beneficiary may challenge a plan administrator's denial of benefits to which he believes he is entitled under 29 U.S.C. § 1132(a)(1)(B), but if he does so, "he does not have a right to a cause of action for breach of fiduciary duty pursuant to § 1132(a)(3)." *Wilkins v. Baptist Healthcare Sys., Inc.,* 150 F.3d at 615. There is no dispute in this case as to whether CIBA was acting as Wagner's fiduciary when it denied his benefits claim. (Doc. # 21 at 8.) Both of Wagner's causes of action seek recovery of denied severance benefits. Therefore, the Court concludes that CIBA reviewed Wagner's claim fully and fairly, pursuant to § 1132(a)(1)(B), and consequently, Wagner has no cause of action for a breach of fiduciary duty under § 1132(a)(3). *Id.* at 616.

### IV. Attorneys Fees

■ ERISA provides that, "In any action under this title ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." 29 U.S.C. § 1132(g)(1). Although this provision ostensibly gives this Court broad discretion to grant attorneys fees to either party under ERISA, the Supreme Court of the United States has held that a district court may only grant attorneys

fees and costs to a claimant that has achieved "some degree of success on the merits." *Hardt v. Reliance Standard Life Ins. Co.*, —— U.S. ——, 130 S.Ct. 2149, 2152, 176 L.Ed.2d 998 (2010).

Because Wagner has failed to show any degree of success on the merits of his claim, this Court finds that he is not entitled to an award of attorneys fees and costs.

### CONCLUSION

CIBA's decision to deny Wagner severance benefits under its Policy is reviewed under an arbitrary and capricious standard. Thus, CIBA's decision is upheld if it is the result of a deliberate and principled reasoning process and is supported by substantial evidence. In this case, CIBA's decision is indeed the result of a deliberate and principled reasoning process and is supported by substantial evidence. Thus, it was not arbitrary or capricious.

CIBA's determination to deny Wagner's severance benefits was consistent with the terms of its Policy and Code. Although Wagner submitted evidence showing that his conduct was not in violation of the Code, and that his actions did not conflict with his duties at CIBA, the Committee determined that his real estate ventures and his soliciting loans from co-workers violated its policies. As a result of his violating the Code, CIBA determined that Wagner was not entitled to severance benefits under the Policy because he had been discharged. In light of the evidence on the record, this determination was reasonable.

Furthermore, Wagner was given a full and fair review of CIBA's decision as a part of the appeals process. CIBA's appeals process was consistent with the procedural requirements of ERISA and the

additional procedural requirements promulgated by the DOL. What is more, at all times, Wagner took full advantage of the processes afforded to him.

Thus, CIBA's Motion for Judgment On the Administrative Record (Doc. # 18) is GRANTED and Wagner's Motion for Judgment On the Administrative Record (Doc. # 21) is OVERRULED. The captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.[8]

---

8. The Court acknowledges the valuable contribution and assistance of judicial extern Sean P. McCormick in drafting this opinion.